ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

ASEEM PADUKONE (CABN 298812)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    Fax: (415) 436-7234
    Aseem.Padukone@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 24-CR-0475-WHA |
| Plaintiff, | OPPOSITION TO MOTION TO DISMISS INDICTMENT ON SECOND AMENDMENT GROUNDS |
| v. | |
| TIMOTHY JEFFREY, a/k/a "BOO," | |
| Defendant. | |

OPP TO MOTION TO DISMISS INDICTMENT ON SECOND AMENDMENT GROUNDS
CASE NUMBER 24-CR-0475 – WHA

Defendant Timothy Jeffrey is a six-time felon who has amassed convictions for being a felon-in-possession of a firearm (twice), carrying a concealed weapon, receiving stolen property, escaping from federal custody, and conspiring and possessing with intent to distribute methamphetamine. He has now been charged with two counts of violating 18 U.S.C. § 922(g)(1) for again being a felon-in-possession of firearms and ammunition. *See* Dkt. 1.

Despite this prolific criminal history, Jeffrey argues that this Court should dismiss the indictment because 18 U.S.C. § 922(g)(1) is unconstitutional as applied to him, based on the Supreme Court's decisions in *New York State Rifle & Pistol Ass'n Inc. v. Bruen*, 597 U.S. 1 (2022) and *United States v. Rahimi*, 144 S.Ct. 1889 (2024). This court, and others in this Circuit, have rejected the argument that *Bruen* and *Rahimi* render the felon-in-possession statute unconstitutional. It should do so again here.

**I.    BACKGROUND**

On April 25, 2023, at approximately 3:22 p.m., Pittsburg Police Department officers received an Automated License Plate Reader alert for a Range Rover which had its license plate entered into the Stolen Vehicle System as a felony vehicle. Officers located the Range Rover after conducting an area search and drove behind it. The driver, later identified as Jeffrey, pulled into a strip mall parking lot, parked in a handicapped spot, exited the vehicle, and fled on foot.

Officers gave chase and observed Jeffrey grabbing an unknown object on his waistband. As Jeffrey approached a fence at the rear of the parking lot, officers observed him throwing an object over the fence. Officers later located a loaded Glock 19 handgun loaded with an extended magazine.

Jeffrey was released from state custody in September 2023, and his whereabouts remained unknown for several months. On March 27, 2024, USMS arrested Jeffrey at an acquaintance's residence. Sheriff's deputies obtained a search warrant for the property and located an AR-15 semi-automatic rifle loaded with 25 rounds of ammunition hidden under the couch.

Jeffrey has sustained over a dozen criminal convictions in over two decades of criminal activity. *See* Padukone Decl., Ex. A. While many of these offenses were misdemeanors, he has at least six felony convictions including: (1) taking a vehicle without consent in 2003 (id. at USA-TJ-000329),

being a convicted person in possession of a firearm in violation of CA PC 12021(D) in 2008 (id. at USA-TJ-000346), receipt of stolen property in violation of CA PC 496(a) in 2010 (id. at USA-TJ-000329), felon-in-possession of a firearm in violation of 18 U.S.C. § 922(g)(1) in 2012 (id. at USA-TJ-000317), escape from federal in 2016 (id. at USA-TJ-000318), and conspiracy to distribute and possession with intent to distribute methamphetamine (id.).

## II.   ARGUMENT

This Court has already rejected a similar Second Amendment challenge in *United States v. Aguilera*, No. CR 23-00217 WHA, 2024 WL 4778044 (N.D. Cal. Nov. 12, 2024). In *Aguilera*, the court held that a felon has no constitutional right to possess a firearm. *Id*. at *1. The government reiterates the arguments it raised in that case and urges the court to reach the same conclusion here.

### A.  The Court Must Deny this Motion Under *Vongxay*

Binding Circuit precedent establishes that 18 U.S.C. § 922(g)(1) passes constitutional muster under the Second Amendment because "felons are categorically different from the individuals who have a fundamental right to bear arms . . ." *United States v. Vongxay*, 594 F.3d 1111, 1114–15 (9th Cir. 2010). Relying on *Vongxay*, courts have rejected challenges to the constitutionality of 18 U.S.C. § 922(g)(1). *See, e.g.*, *United States v. Phillips*, 827 F.3d 1171, 1175 (9th Cir. 2016) (the defendant's non-violent conviction of misprision of felony can serve as a predicate offense for a 922(g)(1) conviction).

Jeffrey refers to *United States v. Duarte*, 827 F.3d 1171 (9th Cir. 2024), *vacated by United States v. Duarte*, 108 F.4th 786 (9th Cir. 2024), but acknowledges that the opinion was vacated. Because "a decision that has been vacated has no precedential authority whatsoever," *Duarte* should have no bearing on the Court's decision. *Marley v. United States*, 567 F.3d 1030, 1038 (9th Cir. 2009) (internal citation omitted). Jeffrey may pursue relief should the *en banc* panel in *Duarte* overrule *Vongxay*.

### B.  *Bruen* and *Rahimi* Do Not Abrogate *Vongxay*

Prior circuit law is controlling unless its "reasoning or theory . . . is clearly irreconcilable with the reasoning or theory of intervening higher authority." *Miller v. Gammie*, 335 F.3d 889, 892–93. Jeffrey argues that that this court should dismiss Jeffrey's indictment in light of the Supreme Court's holdings in *Bruen* and *Rahimi*. Dkt. 16 at 6. In *Bruen*, the Court rejected the two-step means-end

scrutiny framework that most Circuits had applied prior to *Bruen* and instead held that to justify a regulation on firearms, the government "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.  In *Rahimi*, the Court upheld the constitutionality of 18 U.S.C. § 922(g)(8), which prohibits individuals subject to a restraining order from possessing firearms.  *Rahimi*, 602 U.S. 680 (2024).  In so doing, the Court clarified that prohibitions "on the possession of firearms by 'felons'" remains "presumptively lawful" even after *Id*. at 682 (citing *D.C. v. Heller*, 554 U.S. 570, 626, 627 n.26 (2008)).

As this court noted when rejecting a similar challenge in *United States v. Aguilera*, *Vongxay* was decided "three years before our circuit's adoption of the means-end scrutiny framework set aside by *Bruen*." *Aguilera*, 2024 WL 4778044, at *6.  *Vongxay* instead applied *Heller*, by looking at history and concluding that "most scholars of the Second Amendment agree that the right to bear arms was 'inextricably…tied to' the concept of a 'virtuous citizenry' that would protect society through 'defensive use of arms against criminals, oppressive officials, and foreign enemies alike,' and that 'the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals).'" *Vongxay*, 594 F.3d at 1118 (citations omitted).  *Vongxay*'s approach therefore remains the law of the Circuit since it is not "clearly irreconcilable" under *Bruen* or *Rahimi*.  This court is not alone in rejecting a challenge to *Vongxay*'s binding authority.  Courts across this Circuit agree that *Vongxay* remains the law and must be followed.  *See, e.g.*, *United States v. Spagnolo*, No. CR 24-119-BLG-SPW, 2024 WL 5074920, at *3 (D. Mont. Dec. 11, 2024); *United States v. Strelnik*, No. CR 24-53-M-DLC, 2024 WL 4894206, at *2 (D. Mont. Nov. 26, 2024); *United States v. Watts*, No. 3:24-CR-00036-SLG, 2024 WL 4818690, at *1 (D. Alaska Nov. 18, 2024); *United States v. Johnson*, No. 2:23-CR-00099-KJM, 2024 WL 4441932, at *2 (E.D. Cal. Oct. 8, 2024); *United States v. Sampson*, No. CR-24-00266-001-PHX-SMB, 2024 WL 4418299, at *3 (D. Ariz. Oct. 4, 2024); *United States v. Russell*, No. 2:23-CR-00142-TL, 2024 WL 4107312, at *3 (W.D. Wash. Sept. 6, 2024).

### C. Section 922(g)(1) Passes Muster Under the Second Amendment

1. <u>The Rahimi framework</u>

The Second Amendment is a fundamental right that "secures for Americans a means of self-

defense." *Rahimi*, 144 S. Ct. at 1897. However, it "was never thought to sweep indiscriminately." *Id.* To determine whether a statute violates the Second Amendment, this Court "first consider[s] whether the Amendment's plain text covers an individual's proposed course of conduct." *United States v. Perez-Garcia*, 96 F.4th 1166, 1178 (9th Cir. 2024). If so, the question is then whether the government can "justify[] the regulation by showing that it is consistent with our nation's 'historical tradition of firearm regulation.'" *Id.* (quoting *Bruen*, 597 U.S. at 24).

In *Rahimi*, the Court clarified that the government is not required to identify a Founding-Era law that is a "'dead ringer' or a 'historical twin'" to the challenged statute. *Rahimi*, 144 S. Ct. at 1898. Instead, it must demonstrate that "the challenged regulation is consistent with the principles that underpin our regulatory tradition," and merely "'relevantly similar' to laws that our tradition is understood to permit. *Id*. (citing *Bruen*, 597 U.S. at 26-31).

### 2. Historical Tradition of Disarming Felons

The Second Amendment right has long been understood to extend only to "law-abiding" persons. *Heller*, 554 U.S. at 635. In both England and America, "death was the standard penalty for all serious crimes at the time of the founding." *Bucklew v. Precythe*, 587 U.S. 119, 129 (2019) (quotation omitted); see 4 William Blackstone, *Commentaries on the Laws of England* 98 (1769). In England before the Founding, capital punishment extended even to non-violent felonies, such as smuggling, *id.* at 155; fraudulent bankruptcy, *id.* at 156; violating quarantine, *id.* at 162; forging a marriage license, *id.* at 163; and cutting down a cherry tree, *id.* at 4. A felon awaiting execution would be held in prison where he would have no access to arms. See *id.* at 131 (discussing a statute making it unlawful to provide "any arms" to a "prisoner in custody for treason or felony"). A conviction would also usually result in the escheat of the felon's estate and the forfeiture of all his goods and chattels—including, his arms. *See id.* at 379–82. A convicted felon, finally, was deemed "already dead in law" even before his execution. *Id.* at 374. That status, known as "civil death," involved "an extinction of civil rights, more or less complete." *Avery v. Everett*, 18 N.E. 148, 150 (N.Y. 1888). A convicted felon thus had no "right to vote, to sit as a juror, to bear arms, [or] to marry"; indeed, "his physical conditions were such that he could do none of these things." *Id.* at 156 (Earl, J., dissenting) (emphasis added).

    "The Founders shared a similar understanding." *Perez-Garcia*, 96 F.4th at 1183. "At the time of the Second Amendment's ratification, for example, nonviolent crimes such as forgery and horse theft were capital offenses." *Id.* Because the traditional punishment for serious crimes was death, early legislatures had little occasion to enact laws explicitly disarming persons convicted of such crimes. They did, however, enact laws disarming persons who had committed certain offenses that were not punishable by death. For example, an English statute provided that a person could not "keep arms" if he had been "convicted in a court of law of not attending the service of the church of England." 4 Blackstone 55; *see* 3 Jac. 1, c. 5, § 16 (1605) (Eng.). In 1624, Virginia punished a person for "base" and "opprobrious" speech by ordering him "disarmed" and declaring him ineligible to exercise "any priviledge [sic] or freedom" in the colony. David Thomas Koning, *"Dale's Laws" and the Non-Common Law Origins of Criminal Justice in Virginia*, 26 Am. J. Legal Hist. 354, 371 (1982). And in 1775, Connecticut enacted a statute providing that a person who was convicted of "libel[ing] or defam[ing]" certain colonial resolutions "shall be disarmed and not allowed to have or keep any arms." The Public Records of the Colony of Connecticut From May, 1775 to June, 1776, at 193 (Charles J. Hoadly ed., 1890).

    Many states also subjected certain felons to the complete forfeiture of their property. See Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 nn.275–76 (2014) (collecting statutes). And at least some States enacted statutes carrying forward the common-law doctrine of civil death. *See, e.g., In re Deming*, 10 Johns. 232, 233 (N.Y. 1813) (per curiam).

    Moreover, some Founding Era sources expressly recognized that the right to bear arms extended only to law-abiding individuals. In 1780, for example, the Town of Williamsburg, Massachusetts, adopted a resolution proclaiming: "we esteem it an essential priviledge [sic] to keep Arms in Our houses for Our Own Defence [sic] and while we Continue honest and Lawfull [sic] Subjects of Government we Ought Never to be deprived of them." The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780, at 624 (Oscar Handlin & Mary Handlin eds., 1966). And Anti-Federalists at the Pennsylvania ratifying convention proposed a bill of rights that, among other things, forbade "disarming the people or any of them, unless for crimes committed, or real danger of public

OPP TO MOTION TO DISMISS INDICTMENT ON SECOND AMENDMENT GROUNDS
CASE NUMBER 24-CR-0475 – WHA    5

injury from individuals." 2 The Documentary History of the Ratification of the Constitution 598 (Merrill Jensen ed., 1976). Thus, given that individuals historically faced capital punishment for even nonviolent crimes, such as horse theft, the modern and less severe punishment of disarmament for a more serious crime, or felony conviction, has a basis in the nation's historic tradition.

### 3. Section 922(g)(1) Fits Within this Tradition of Disarmament

Section 922(g)(1) prohibits a person from possessing a firearm or ammunition in or affecting commerce if he has been convicted of "a crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1). A knowing violation is punishable by up to 15 years of imprisonment. *See* 18 U.S.C. § 924(a)(8). Section 922(g)(1) is subject to several exceptions. The provision does not cover certain offenses "relating to the regulation of business practices." 18 U.S.C. § 921(a)(20)(A). It also does not cover state offenses that are classified by state law as misdemeanors and that are punishable by two years of imprisonment or less. *See* 18 U.S.C. § 921(a)(20)(B). And it does not cover convictions that have been expunged or set aside, or offenders who have been pardoned or had their civil rights restored. *See* 18 U.S.C. § 921(a)(20). Until 1992, Congress also allowed an individual to obtain relief from Section 922(g)(1)'s bar to possessing a firearm by demonstrating to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) that "the circumstances regarding the disability, and [his] record and reputation, are such that [he] will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." 18 U.S.C. § 925(c); *see id.* (granting authority to the Attorney General); 27 C.F.R. § 478.144 (delegating authority to the Director of ATF). But since 1992, Congress has effectively suspended that provision by prohibiting the use of federal funds to process applications for such relief. *See Logan v. United States*, 552 U.S. 23, 28 n.1 (2007).

Section 922(g)(1) is consistent with the principles that underpin this nation's regulatory tradition and is a faithful application of the balance struck by the founding generation to modern circumstances. "[I]t is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir.), *cert. denied*, 140 S. Ct. 645 (2019). Section 922(g)(1) prohibits the possession of

firearms by persons who have committed serious crimes.

Just as death and forfeiture were appropriate consequences for those who had committed serious crimes, Section 922(g)(1) strips a felon of the right to carry arms. Indeed, the "English tradition of lawful disarmament coexisted with the fundamental right to keep and bear arms." *Perez-Garcia*, 96 F.4th at 1187. Since the English right to bear arms (subject to government regulation) is understood to be the predecessor to our Second Amendment, "this background supports the view that the Second Amendment also empowers Congress to authorize the disarming of individuals who are not law-abiding, responsible citizens," such as those convicted of a felony. *Id*.

As the Court made clear in *Rahimi*, "[W]e do not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." *Rahimi*, 144 S. Ct. at 1901 (citing *Heller*, 554 U.S. at 626)). Accordingly, "prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" *Id*. at 1902 (quoting *Heller*, 554 U.S. at 626–27 & n.26).

Common sense and experience also suggest that "felons are more likely to commit violent crimes" than are law-abiding individuals. *United States v. Barton*, 633 F.3d 168, 175 (3d Cir. 2011); *see Mai v. United States*, 952 F.3d 1106, 1117 (9th Cir. 2020) ("[I]n enacting § 922(g)(4), Congress determined that, like felons and domestic-violence assailants, those who have been involuntarily committed to a mental institution also pose an increased risk of violence."). "[N]umerous studies" show a "link between past criminal conduct and future crime, including gun violence." *Binderup v. Attorney General United States*, 836 F.3d 336, 400 (3d Cir. 2016) (en banc) (Fuentes, J., concurring in part, dissenting in part, and dissenting from the judgments); *Marchese v. California*, 545 F.2d 645, 647 (9th Cir. 1976) ("There is a legitimate interest in minimizing the felonious use of firearms, and a legislature reasonably may decide that persons with criminal convictions have more of a tendency to commit a crime of violence than persons without criminal records.").

And the Supreme Court has recognized that persons "convicted of serious crimes," as a class, can "be expected to misuse" firearms. *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 119 (1983). Accordingly, "Congress today, like the founding era legislatures described above, retains the

power to disarm narrow segments of the population whom it deems a threat to public safety," such as felons. *Perez-Garcia*, 96 F.4th at 1189. As this court recognized in *Aguilera*, the First, Third, Sixth, and Eighth Circuits have "[a]ll have held that [Section 922(g)(1)] passes muster" post-*Rahimi*. *United States v. Aguilera*, No. CR 23-00217 WHA, 2024 WL 4778044, at *15 (N.D. Cal. Nov. 12, 2024). This court should again agree.

### D. Section 922(g)(1) Passes Muster Under the Second Amendment

#### 1. The Court Should Reject Any As-Applied Challenge

To uphold Section 922(g)(1), this Court need only recognize that Congress may disarm individuals who have been convicted of crimes that satisfy the common definition of a felony— that is, crimes punishable by imprisonment for more than one year. In interpreting other provisions of the Bill of Rights that require the Court to distinguish among different types of crimes, the Court has traditionally focused on the "maximum authorized penalty"—which "provides an 'objective indication of the seriousness with which society regards the offense'"—rather than on "the particularities of an individual case." *Lewis v. United States*, 518 U.S. 322, 328 (1996) (brackets and citation omitted). For example, the Grand Jury Clause applies only to "capital" or "infamous" crimes, U.S. Const. amend. V, and a crime is "infamous" if it is punishable by "imprisonment for more than a year," *Branzburg v. Hayes*, 408 U.S. 665, 687 n.24 (1972) (citation omitted). The Sixth Amendment right to a jury trial similarly does not extend to petty offenses, and an offense is petty if it is punishable by a prison term of six months or less. See *Blanton v. City of North Las Vegas*, 489 U.S. 538, 541–45 (1989). This Court should follow a similar approach in interpreting the Second Amendment, which is subject to the same "body of rules" as "the other Bill of Rights guarantees." *Bruen*, 597 U.S. at 6 (citation omitted). The maximum authorized penalty for the offense by itself establishes that the crime is serious enough to support disarmament. See *Medina*, 913 F.3d at 160–61.

Individual as-applied challenges would create a system where the judicial branch usurps the role of the Executive Branch in exercising its role of deciding when to make exceptions to particular laws." The Federalist No. 74, at 501 (Alexander Hamilton) (Jacob E. Cooke ed. 1961).

Such as applied challenges would also differ from the approach taken for other rights that

forfeited by criminals upon conviction, such as the right to vote or hold public office. *See Spencer v. Kemna*, 523 U.S. 1, 8–9 (1998) (noting convicted felons suffer various collateral consequences, such as ineligibility to serve on juries, hold public office, or obtain naturalization). Such a test would also be unworkable. Courts "possess neither the resources to conduct the requisite investigations nor the expertise to predict accurately which felons may carry guns without threatening the public's safety." *Pontarelli v. United States Dep't of the Treasury*, 285 F.3d 216, 231 (3d Cir. 2002) (en banc); see *Mai*, 952 F.3d at 1119 ("[T]he Second Amendment does not demand an individualized hearing to assess [specific person's] own personal level of risk." (internal quotation omitted)). Accordingly, Section 922(g)(1) should not be subject to as-applied challenges.

### 2. Any As-Applied Challenge as to Jeffrey Fails

Even if this Court were to entertain an as-applied challenge Jeffrey, his criminal history forecloses any argument that his Second Amendment rights were violated. Jeffrey has at least six prior felony convictions, including a federal drug trafficking offense and receipt of stolen property.

Several historical laws imposed severe penalties for possession and trafficking of contraband. The First Congress, which adopted the Second Amendment's language, punished with death piracy on the high seas, receiving goods taken by pirates, and counterfeiting and forgery of public securities. An Act for the Punishment of Certain Crimes Against the United States, §§ 9-11, 14, 1 Stat. 112, 115 (1790). The Second Congress punished with death theft of the mail. An Act to Establish the Post-Office and Post Roads within the United States, § 17 1 Stat. 232, 237 (1792). States also punished with death counterfeiting and forgery of public securities. *See* 2 Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788) at 260-61 (1886) (1786 law); 9 William Waller Hening, Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature 302 (1821) (1777 law).

Additionally, knowing possession of a stolen horse was a capital offense at the founding, *see* Act for Punishment of Horse-Stealers, and other Offenders, 1744 Md. Laws 17, at least when the thief was himself was first convicted as a principal and the possessor could be prosecuted as an accessory, *see* 6 William Waller Hening, *The Statutes at Large; Being a Collection of All the Laws of Virginia from the*

*First Session of the Legislature, in the Year 1619*, pages 130-31 (1819) (1748 law); *see also Standefer v. United States*, 447 U.S. 10, 15 (1980) (explaining the common-law rule that "an accessory could not be convicted without the prior conviction of the principal offender"). These are all "distinctly similar" laws severely punishing trafficking in contraband such as narcotics.

Even the *Duarte* majority, despite its skepticism about the constitutionality of 922(g)(1), acknowledged that drug trafficking could justify "permanent disarmament" because "[modern-day] drug trafficking plainly poses substantial risks of confrontation that can lead to immediate violence.'" *Duarte*, 101 F.4th at 690 (quoting *United States v. Alaniz*, 69 F.4th 1124, 1129-30 (9th Cir. 2023)). Indeed, concluding that drug trafficking can pose a danger to the community can have "a reasonable basis in common experience." *Perez-Garcia*, 96 F.4th 1190 (citing *United States v. Strong*, 775 F.2d 504, 508 (3d Cir. 1985))  See *United States v. Barton*, 633 F.3d 168, 174 (3d Cir. 2011) ("[O]ffenses relating to drug trafficking . . . are closely related to violent crime."); *United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011) ("[D]rug dealing is notoriously linked to violence."); *United States v. Diaz*, 864 F.2d 544, 549 (7th Cir. 1988) ("[T]he illegal drug industry is, to put it mildly, a dangerous, violent business."); *Sampson*, 2024 WL 4418299, at *4 ("Defendant's convictions for possession of drugs are relevantly similar to laws prohibiting possession contraband, and perhaps posing an increased risk of harm to the community.  See, e.g., Smith v. United States*, 508 U.S. 223, 240 (1993) ("[D]rugs and guns are a dangerous combination.")).

Drug traffickers are apt to use firearms "to protect drug stockpiles, to preempt encroachment into a dealer's 'territory' by rival dealers, and for retaliation." *United States v. Luciano*, 329 F.3d 1, 6 (1st Cir. 2003); *see Smith v. United States*, 508 U.S. 223, 240 (1993) ("[D]rugs and guns are a dangerous combination."). A 2021 study found that 73% of drug traffickers were re-arrested within five years of their release from state prison. Bureau of Justice Statistics, Recidivism of Prisoners Released in 24 States in 2008: A 10-Year Follow-Up Period (2008-2018), at 5 (Table 5), https://bjs.ojp.gov/BJS_PUB/rpr24s0810yfup0818/Web%20content/508%20compliant%20PDFs. Many of those arrests were for violent offenses. Of those originally arrested for drug-related offenses (not limited to drug trafficking), 34.8% were re-arrested within ten years for violent crimes such as homicide

(1.1%), robbery (6.2%), and assault (27.7%). *Id.* at 10 (Table 11).

Jeffrey's status as a recidivist offender also forecloses a Second Amendment challenge. The Third Circuit recognized, for example, that "Pennsylvania regulations intended to protect the Philadelphia market from competition required a repeat offender to 'forfeit all his goods, and [be] imprisoned at the discretion of the court.'" *United States v. Moore*, 111 F.4th 266, 270 (3d Cir. 2024) (citing Act of Apr. 5, 1779, 9 Statutes at Large of Pennsylvania, at 387, 388–89 (James T. Mitchell & Henry Flanders eds., 1896)).

Given the nature and frequency of his crimes, the Court should reject Jeffrey's as-applied challenge.

### III. CONCLUSION

Accordingly, this Court should deny Jeffrey's motion to dismiss the indictment.

DATED: December 17, 2024

ISMAIL J. RAMSEY
United States Attorney

/s/
ASEEM PADUKONE
Assistant United States Attorney